1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    Mark Walsh,                                 No. 1:23-cv-01774-KJM-BAM

12                        Plaintiff,               ORDER

13          v.

14    Bob Martin, et al.,

15                        Defendants.

16

17          Plaintiff, an employee of the San Luis & Delta-Mendota Water Authority (the Authority),

18    brings claims against defendants under 42 U.S.C. § 1983 for retaliation in violation of the First

19    Amendment.  Defendants are plaintiff's supervisors and the Authority; they move for summary

20    judgment.  For the following reasons, the court **grants defendants' motion**.

21    **I.      EVIDENTIARY RECORD**

22          The court has compared the parties' respective statements of fact and the underlying

23    record and reviewed the relevant deposition transcripts.  *See* Defs.' Statement of Undisputed

24    Facts (Defs.' SUF); ECF No. 32-2; Pls.' Opp'n to Defs.' Statement of Undisputed Facts (Opp'n

25    SUF), ECF No. 27-1; Notice of Lodging, ECF No. 27-4.  The court addresses evidentiary

26    objections only to the extent necessary and relies only on evidence that is properly considered on

27    summary judgment.  Based on a review of the record, the court finds the following facts are

28    undisputed.  When the evidence does conflict, the court has viewed that evidence in the light most

                                              1

1   favorable to Walsh, the non-moving party, as required by Rule 56.  *See* Fed. R. Civ. P. 56(a);

2   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

3          The San Luis & Delta-Mendota Water Authority is a public entity that  operates and

4   maintains certain United States Bureau of Reclamation facilities across various counties in

5   California.  *See* Opp'n SUF No. 1.  Plaintiff Mark Walsh has worked for the Authority in various

6   roles for nearly thirty years, including as a Civil Maintenance Worker, Hydro Tech II, and

7   currently as a Hydro Tech III.  *Id.* No. 2; Walsh Dep. at 229–30, Ex. A, ECF No. 27-4.[1]  Walsh

8   brings this lawsuit against the Authority and his supervisors, who are high-ranking employees of

9   the Authority including the Director of Operations and Maintenance Facilities, Bob Martin, the

10  Director of Human Resources and Administration, Laures Stiles, and the Operations and

11  Maintenance Manager, Chauncey Lee (collectively the Authority or defendants).  *See generally*

12  Compl. ¶¶ 3–5, ECF No. 1.

13         The events underlying this matter began in 2015, when Walsh was a Hydro Tech II.  On

14  April 16, while conducting water flow measurements on the Delta-Mendota Canal (the Canal)

15  near the Panoche Water District, Walsh observed a straw hat caught in a water vortex and, based

16  on his experience, suspected water was being stolen through an illegal diversion.  Opp'n SUF

17  Nos. 19–30.  On Monday, April 20, 2015, Walsh emailed Frances Mizuno, the Authority's

18  Assistant Executive Director, requesting a meeting to discuss the matter privately and review

19  photographs he took while patrolling the Canal.  *Id.* Nos. 31–32.  Walsh chose to contact Mizuno

20  rather than his immediate supervisor, Chauncey Lee, because he believed Lee would not act on

21  the report due to Lee's personal ties to officials within the Panoche district.  Walsh Dep. at 163–

22  66.  The following day, Walsh met with Mizuno and Paul Stearns, both senior Authority officials,

23  and reported the suspected abnormal water diversion.  *Id.* at 170–72; Opp'n SUF 32–33.  After an

24  investigation, the Authority confirmed the diversion was unauthorized and reported the incident

25  to the federal Bureau of Reclamation.  Opp'n SUF at 36.

---

[1] Generally, when citing page numbers on filings bearing the pagination automatically generated by the CM/ECF system, the court uses the CM/ECF pagination.  When citing to depositions, however, the court uses the internal pagination appearing on the cited deposition.

Approximately one year later, in mid-2016, the Federal Bureau of Investigation (FBI) interviewed Walsh and other Authority employees about the illegal water diversion. *Id.*; Walsh Dep. at 180. Walsh testified that before he met with the FBI agents, Mizuno advised him to limit his cooperation, stating, "don't give them any more information than what they ask for." Walsh Dep. at 333. For nearly nine years after the 2016 meeting, Walsh continued cooperating with the ongoing investigation, meeting with federal agents up to twice monthly. *Id.* at 342. The Authority was aware of Walsh's cooperation with the federal investigation and compensated him for the time spent with investigators during work hours. *Id.* at 345.

In 2018, the Authority promoted Walsh from Hydro Tech II to Hydro Tech III. *Id.* at 230; Opp'n SUF No. 50. In October 2020, the Authority posted a job opening for a Civil Maintenance Foreman, a promotion Walsh wanted to apply for. Walsh Dep. 256; Opp'n SUF No. 52. Approximately two years before the job was posted, Lee advised Walsh the Authority would likely change the applicant criteria for Foreman positions to require a Class A driver's license. Walsh Dep. 272–74. Consistent with Lee's advisement, the 2020 listing for the position required a valid Class A license. Walsh Dep. at 256; Opp'n SUF No. 53; Walsh Decl. ¶ 14 & Doc. 91 (2020 Foreman Job Posting) at 15, ECF No. 27-2. An earlier 2014 posting for the same position had stated the Authority might require a Class A or B license upon appointment, but did not require an applicant to have a license at the time of application. Walsh Dep. at 258–59. At least one other job posting in 2024 for a Maintenance Worker also required a Class A drivers' license but permitted applicants to obtain the license within twelve months of their appointment. Walsh Decl. ¶ 15 & Docs. 137–39 (2024 Maintenance Job Posting) at 41, ECF No. 27-2.

Having let his Class A license expire several years prior and taken no steps to renew his license despite Lee's warning, Walsh called the Human Resources Director, Laures Stiles, to discuss the license requirement after the Foreman position was posted. Walsh Dep. at 249, 265. Walsh testified at deposition Stiles advised him the license was needed to apply. *Id.* at 265–66. Stiles testified she does not recall this conversation, but that "it's usually at the time of appointment that they have to have a Class A [license]." Notice of Lodging, Stiles Dep. at 30 Ex. C, ECF No. 27-4. Because Walsh's Class A license had expired, and given the conversation he

1   says he had with Stiles, he ultimately did not apply for the Foreman position and instead remained

2   a Hydro Tech III.  Walsh Dep. 267–68; Opp'n SUF No. 56.  The two applicants selected to

3   interview for the Foreman position had Class A drivers' licenses at the time of application and no

4   evidence in the record suggests any applicant was given a grace period to comply.  Opp'n SUF

5   No. 60; Walsh Dep. at 269.

6       In 2021, the Authority posted an opening for a Water Operations Superintendent.  Opp'n

7   SUF No. 73.  Walsh informed Lee of his interest in being promoted to Superintendent, and Lee

8   encouraged him to apply.  *Id.* No. 74.  Walsh knew that Seth Harris, a colleague who had

9   previously held the Superintendent position, also was applying.  *Id.* No. 75.  After submitting his

10  application, Walsh heard that Martin had encouraged Harris to apply.  *Id.* No. 77.  On December

11  14, 2021, the Human Resources office contacted Walsh to schedule an interview for the

12  promotional position.  *Id.* Nos. 78–80; Walsh Dep. 297–98.  During this phone call, Walsh

13  declined and withdrew his application, stating "don't waste my time because I already heard that

14  Seth's going to get the job."  Walsh Dep. at 295; Opp'n SUF 78–80.  Harris eventually was

15  selected for the promotion, and Walsh remained a Hydro Tech III.  Opp'n SUF No. 83.

16  **II.    PROCEDURAL BACKGROUND**

17      Walsh filed the original complaint in this action on December 27, 2023.  *See generally*

18  Compl.  It asserts a single claim under § 1983 for retaliation against a public employee in

19  violation of the First Amendment.  *See id.* at 4.  Defendants now move for summary judgment.

20  *See generally* Mot., ECF No. 23.  The motion is fully briefed.  *See generally* Mem. P. & A., ECF

21  No. 23-1; Opp'n, ECF No. 27; Reply, ECF No. 28.  The court held oral argument at a hearing on

22  August 28, 2025.  Mins. Hr'g, ECF No. 32.  Kevin Little appeared for plaintiff.  *Id.*  Golnar Fozi

23  appeared for defendants.  *Id.*

24  **III.   LEGAL STANDARD**

25      Summary judgment is appropriate if "there is no genuine dispute as to any material fact

26  and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is

27  "genuine" if "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v.*

28  *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome

1    of the suit under the governing law." *Id.*  The parties must cite "particular parts of materials in

2    the record." Fed. R. Civ. P. 56(c)(1).  The court then views the record in the light most favorable

3    to the nonmoving party and draws reasonable inferences in that party's favor. *Matsushita*, 475 at

4    587–88; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

5          The party moving for summary judgment must first carry its initial burden of production.

6    *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Nissan Fire & Marine Ins. Co. v. Fritz*

7    *Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  Where the moving party will have the burden of

8    proof on an issue at trial, then it must cite portions of the record to show "no reasonable jury"

9    could find in favor of the non-moving party. *Snell v. Bell Helicopter Textron, Inc.*, 107 F.3d 744,

10   746 (9th Cir. 1997).  It must "establish beyond controversy every essential element" of that claim

11   or defense. *S. California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (per

12   curiam) (internal quotations marks and citation omitted).  Where the moving party does not have

13   the burden to prove the disputed claim or defense at trial, then it must carry its initial burden of

14   production at summary judgment in one of two ways: "either produce evidence negating an

15   essential element of the nonmoving party's claim or defense or show that the nonmoving party

16   does not have enough evidence of an essential element to carry its ultimate burden of persuasion

17   at trial." *Nissan Fire*, 210 F.3d at 1102.  Then, to carry its burden of persuasion on the motion,

18   the moving party must "persuade the court that there is no genuine issue of material fact." *Id.*

19         "If a moving party fails to carry its initial burden of production, the nonmoving party has

20   no obligation to produce anything, even if the nonmoving party would have the ultimate burden

21   of persuasion at trial." *Id.* at 1102–03.  If, however, the moving party does carry its initial burden

22   of production, the nonmoving party must produce evidence to support its claims or defenses and

23   "establish that there is a genuine issue of material fact." *Matsushita*, 475 U.S. at 585.  "If the

24   nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the

25   moving party wins the motion for summary judgment.  But if the nonmoving party produces

26   enough evidence to create a genuine issue of material fact, the nonmoving party defeats the

27   motion." *Nissan Fire*, 210 F.3d at 1103 (citing *Celotex*, 477 U.S. at 322 and Fed. R. Civ. P.

28   56(c)).

1    This does not mean "a moving party without the ultimate burden of persuasion at trial may

2    use a summary judgment motion as a substitute for discovery." *Nissan Fire*, 210 F.3d at 1105.

3    "[I]t is never enough simply to state that the non-moving party cannot meet its burden at trial."

4    *Id.* (quoting *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991)). "In a typical case,

5    in order to carry its initial burden of production by pointing to the absence of evidence to support

6    the nonmoving party's claim or defense, the moving party will have made reasonable efforts,

7    using the normal tools of discovery, to discover whether the nonmoving party has enough

8    evidence to carry its burden of persuasion at trial." *Id.*

9    **IV.    ANALYSIS**

10    Defendants argue they are entitled to summary judgment on Walsh's First Amendment

11    retaliation claim because: (1) defendants took no adverse employment action against Walsh,

12    (2) Walsh's speech is not protected under the First Amendment, and (3) Walsh's expressive

13    conduct was not a substantial or motivating factor for any alleged adverse action. *See generally*

14    Mem. P. & A. Walsh disagrees and argues material disputes of fact preclude summary judgment

15    at this stage. *See generally* Opp'n. While defendants' briefing cites to very little supporting

16    authority or relevant caselaw, the court proceeds to consider the merits of the motion, without

17    engaging in the work defendants should have performed to fully present their position.[2]

18    It is well established that public employees do not lose their First Amendment rights when

19    going to work. *See Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). Rather, the First Amendment

20    shields public employees from employment retaliation for their protected speech activities.

21    *See id.*; *Connick v. Myers*, 461 U.S. 138, 140 (1983). But acknowledging both a public

22    employee's free speech rights and "the State's interests as an employer in regulating the speech of

23    its employees," *Connick*, 461 U.S. at 140, courts must "arrive at a balance between the interests

---

[2] All motions and filings with the court must follow this district's Local Rules and this court's standing civil order. Parties are specifically reminded of this court's rules regarding citations. The basic purpose of a legal citation is to allow the reader to locate a cited source accurately and efficiently. Cited authority should be relevant to the matter at hand and identify the source and specific page referenced. While the court here grants defendants' motion, it cautions defense counsel that future filings in this court must meet the court's requirements and generally satisfy significantly higher standards.

1    of the [public employee], as a citizen, in commenting upon matters of public concern and the

2    interest of the State, as an employer, in promoting the efficiency of the public services it performs

3    through its employees," *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).  The Ninth Circuit

4    has distilled the evolution and "tangled history" of *Pickering* as informing the speech protections

5    afforded to public employees into a "sequential five-step series of questions":

6              (1) [W]hether the plaintiff spoke on a matter of public concern;
7              (2) whether the plaintiff spoke as a private citizen or public
8              employee; (3) whether the plaintiff's protected speech was a
9              substantial or motivating factor in the adverse employment action;
10             (4) whether the state had an adequate justification for treating the
11             employee differently from other members of the general public; and
12             (5) whether the state would have taken the adverse employment
13             action even absent the protected speech.

14    *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).

15             In the Ninth Circuit, the plaintiff bears the burden of demonstrating the first three steps

16    make out a prima facie case of First Amendment retaliation.  *Dodge v. Evergreen Sch. Dist. #114*,

17    56 F.4th 767, 776 (9th Cir. 2022) (citing *Howard v. City of Coos Bay*, 871 F.3d 1032, 1044 (9th

18    Cir. 2017)).  The first two inquiries "form the lodestar question of whether the plaintiff's speech

19    is protected under the First Amendment."  *Burch v. City of Chubbuck*, 146 F.4th 822, 832 (9th

20    Cir. 2025) (citations omitted).  If the plaintiff's speech is protected, the inquiry proceeds to the

21    third step and the plaintiff must demonstrate his protected speech was a substantial or motivating

22    factor for any alleged adverse employment action.  *Id.*; *Eng*, 552 F.3d at 1070 (citing *Connick*,

23    461 U.S. 138 (1983); *Marable v. Nitchman*, 511 F.3d 924, 930, 932-33 (9th Cir. 2007)).  As

24    explained above, at the summary judgment stage, defendants may prevail by "produc[ing]

25    evidence negating an essential element of the nonmoving party's claim or defense or show that

26    the nonmoving party does not have enough evidence of an essential element to carry its ultimate

27    burden of persuasion at trial."  *Nissan Fire*, 210 F.3d at 1102.

28             If the plaintiff meets his burden on the first three steps, the burden shifts to defendants to

29    address the remaining steps and show "adequate justification" for their actions or, in the

30    alternative, that they "would have reached the same adverse employment decision even in the

1  absence of the employee's protected conduct." *Eng*, 552 F.3d at 1071–72 (citations and

2  alterations in original omitted).  "Only if the government fails both the fourth and fifth steps does

3  the plaintiff establish a First Amendment violation." *Burch*, 146 F.4th at 833 (citing *Greisen v.*

4  *Hanken*, 925 F.3d 1097, 1108 (9th Cir. 2019)); *see also Mt. Healthy City Sch. Dist. Bd. of Educ.*

5  *v. Doyle*, 429 U.S. 274 (1977).

6  **A.    Public Concern**

7          The court proceeds to an analysis of Walsh's retaliation claim, analyzing first whether the

8  speech at issue involved a matter of public concern.  The "public concern inquiry is purely a

9  question of law." *Gibson v. Office of Atty. Gen., State of California*, 561 F.3d 920, 925 (9th Cir.

10  2009) (quoting *Eng*, 552 F.3d at 1070).  The Ninth Circuit has defined the scope of public

11  concern broadly, and declined the use of "rigid multi-part tests that would shoehorn

12  communication into ill-fitting categories."  *See Desrochers v. City of San Bernardino*, 572 F.3d

13  703, 709–10 (9th Cir. 2009).  Instead, courts ask "whether the speech addressed matters of

14  'public' as opposed to 'personal' interest."  *Id.* at 709 (citing *Connick*, 461 U.S. at 147).  If the

15  content of the speech involves "issues about which information is needed or appropriate to enable

16  the members of society to make informed decisions about the operation of their government" the

17  speech is of public concern.  *Id.* at 710 (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1113–

18  14 (9th Cir. 1983)).

19         Defendants do not dispute Walsh's speech about an alleged "criminal scheme involving

20  the theft of federal water from the Delta-Mendota Canal" was a matter of public, rather than

21  private concern.  As a matter of law, Walsh's speech about criminal water theft goes to the very

22  core of a government entity's functionality, efficiency and performance, and is inherently a matter

23  of public concern.  *See Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 926 (9th Cir. 2004).

24  **B.    Private Citizen**

25         Even when a public employee speaks on a matter of public concern, the First Amendment

26  does not protect that employee for statements made pursuant to their official duties.  *Anthoine v.*

27  *North Central Counties Consortium*, 605 F.3d 740, 745 (9th Cir.2010) (citing *Ceballos*, 547 U.S.

28  at 413).  This is because "[r]estricting speech that owes its existence to a public employee's

8

1    professional responsibilities does not infringe any liberties the employee might have enjoyed as a

2    private citizen," and such restrictions "simply reflect[] the exercise of employer control over what

3    the employer itself has commissioned or created." *Ceballos*, 547 U.S. at 421–22 (citing

4    *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995)).

5            The Ninth Circuit has held that a public employee speaks as a private citizen "if the

6    speaker 'had no official duty' to make the questioned statements, or if the speech was not the

7    product of 'performing the tasks the employee was paid to perform.'" *Ellins v. City of Sierra*

8    *Madre*, 710 F.3d 1049, 1058–59 (9th Cir. 2013) (quoting *Eng*, 552 F.3d at 1071)). "While the

9    question of the scope and content of a plaintiff's job responsibilities is a question of fact, the

10   ultimate constitutional significance of the facts as found is a question of law." *Id.* (citing *Eng*,

11   552 F.3d at 1071 ("[T]he question of the scope and content of a plaintiff's job responsibilities is a

12   question of fact.") and *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1129 (9th

13   Cir. 2008) ("Because the task of determining the scope of a plaintiff's job responsibilities is

14   concrete and practical rather than abstract and formal, we are confident that a factual

15   determination of a plaintiff's job responsibilities will not encroach upon the court's prerogative to

16   interpret and apply the relevant legal rules.")). To determine if a public employee's speech was

17   made pursuant to his duties, the court "look[s] beyond the four corners of his formal job

18   description and conduct[s] a 'practical' and 'fact-intensive' inquiry" analyzing three factors:

19   (1) whether "the employee confined his communications to his chain of command"; (2) the

20   "subject matter of the communication"; and (3) "whether the employee spoke in direct

21   contravention to his supervisor's orders." *Burch*, 146 F.4th at 834 (quoting *Dahlia v. Rodriguez*,

22   735 F.3d 1060, 1074–76 (9th Cir. 2013) (en banc)).

23           Here, Walsh asserts he engaged in two distinct protected speech activities as a private

24   citizen, when he made "his internal report to management about the illegal diversion," and when

25   he "cooperat[ed] with federal investigators." Opp'n at 13. Defendants assert Walsh's speech in

26   both instances was private speech required given the duties of his Hydro Tech II position. Mem.

27   P. & A. at 13–14.

1              **1.    Internal Authority Report**

2        Defendants assert Walsh's reports about the unauthorized water diversion to Authority

3    leadership qualifies as speech as a public employee because as part of his employment, "[h]e was

4    expected to discover and report unauthorized water diversions and did exactly what he was

5    trained to do."  Mem. P. & A. at 14 (citing Notice of Lodging, Lee Dep. at 10, 14–15, ECF No.

6    27-4).  Defendants further explain that Walsh "discovered and reported the water diversion in the

7    course and scope of his employment, during work hours, and as part of his job duties."  *Id.*

8    Walsh disagrees and asserts his discovery of the water theft "occurred by complete happenstance"

9    and that regularly monitoring the specific "very old and presumably closed," SUF No. 6, water

10   turnouts for irregularities "isn't anyone's job."  Opp'n at 13 (citing Lee Dep. at 10, 14–15).

11       Whether the discovery of the water diversion occurred by "happenstance" is irrelevant to

12   the court's analysis.  Instead, the court must determine if the record supports a finding as a matter

13   of law that Walsh's reporting of his discovery was properly considered part of his individual

14   official duties as a public employee.  That is, whether his speech was "more akin to a 'routine'

15   report or function of their position, rather than an attempt to raise alarm bells on an issue not

16   normally within the employee's purview."  *Burch*, 146 F.4th at 835 (quoting *Dahlia*, 735 F.3d at

17   1075).

18       On this record, the undisputed facts show Walsh's report to the Authority of the

19   suspicious water flow and his recommendation that the Authority install anti-theft devices was

20   speech made pursuant to his official duties and as a routine function of his employment.  In his

21   deposition, when asked if it was his job to report "any kind of diversion that's not supposed to

22   be," Walsh testified, "I would say yes."  Walsh Dep. at 140.  Walsh's statement at deposition

23   aligns with defendant Lee's testimony that reporting any suspicious incidents while on patrol,

24   even if discovered serendipitously, is the duty of all Authority employees.  Lee Dep. at 10, 14–15.

25       Consistent with his understanding of his job duties, Walsh reported these inconsistencies

26   to the Water Authority's Assistant Executive Director, Frances Mizuno.  Walsh says his report to

27   Mizuno "jumped the chain of command to the top," and bypassed immediate supervisors because

28   of his perception those supervisors had conflicts of interest.  Walsh Dep. at 164.  While the Ninth

1   Circuit has found a public employee's report to a high-level official outside of his chain of

2   command can be protected speech, it is undisputed that Mizuno is within Walsh's chain of

3   command.  *Id.*; *see, e.g.*, *Freitag v. Ayers*, 468 F.3d 528, 544–45 (9th Cir. 2006) (prison guard's

4   complaints to officials in her chain of command, that inmates were sexually harassing her, were

5   made pursuant to her official duties; remanding for determination whether CDCR Director was

6   within chain of command).  Here, Mizuno was the signatory on multiple commendations from the

7   Authority to Walsh, she sat on promotional interview panels, and Walsh acknowledges she was

8   atop his chain of command, indicating she was within Walsh's direct chain of command.  *See*

9   Walsh Dep. at 200, 204, 209, 222.  At hearing, plaintiff's counsel agreed Mizuno was in Wash's

10  chain of command and acted as one of his supervisors.

11      Because the undisputed factual record shows reporting suspicious activity along the Canal

12  was within the scope of Walsh's general duties and because Walsh reported this to Mizuno, an

13  individual within his chain of command, as a matter of law Walsh's speech reporting the

14  diversion to his supervisors was uttered in his capacity as a public employee and therefore is not

15  subject to the protections of the First Amendment.  *See, e.g.*, *Freitag*, 468 F.3d at 544–45.

16                          **2.    Federal Investigation**

17      Walsh also asserts his cooperation with federal investigators was protected speech made

18  as a private citizen.  Opp'n at 13.  Defendants disagree and argue Walsh's cooperation with

19  federal investigators was undertaken in his capacity as a public employee because Walsh spoke to

20  the FBI at the direction of the Water Authority and on the Authority's time and payroll.  Reply at

21  4–5.

22      While the record undisputedly shows the Authority paid Walsh for the time he spent with

23  federal agents, Walsh also testified that Mizuno instructed him to limit his cooperation with the

24  federal investigators.  Walsh Decl. ¶ 26.; Walsh Dep. at 330–31, 342.  Defendants do not dispute

25  that Mizuno told Walsh "don't give [federal investigators] any more information than what they

26  ask for."  *Id.* at 333.  Despite Mizuno's instructions or the exact nature of her counsel, it is

27  undisputed Walsh provided "extensive voluntary cooperation," beyond any requirements of his

28  public employment and Mizuno's direction.  Walsh Decl. ¶ 26; *cf. Dahlia*, 735 F.3d at 1074–76.

1    Defendants do not claim, and the record does not support, that participating in FBI investigation

2    was a "routine" part of Walsh's employment at the Authority.  *Dahlia*, 735 F.3d at 1074–76.

3         For purposes of summary judgment, the court concludes there is no genuine dispute that

4    Walsh's extensive cooperation with federal investigators went beyond the scope of the official job

5    responsibilities of a Hydro Tech.  While Walsh's superiors asked him to cooperate with the FBI's

6    initial interview process, Walsh's duties as a Hydro Tech II and then Hydro Tech III did not

7    encompass assisting federal law enforcement for nearly a decade.  Again, nothing in the record

8    suggests such extensive cooperation was part of his ordinary assignments or job description.  On

9    the contrary, Mizuno's instructions to Walsh to limit his cooperation confirm that his years-long

10   assistance to federal investigators fell outside the scope of his employment.  Walsh Dep. at 333.

11   Although the Authority paid Walsh for his participation in the FBI's investigation, compensation

12   alone does not convert an employee's private citizen conduct into official duties, particularly

13   when the nature of the work is unrelated to the employee's role.  Instead, under *Dahlia*, the

14   determination of whether speech is made as part of one's official duties is a "practical," fact-

15   specific inquiry that considers the realities of the job, not merely formal job descriptions and

16   compensation.  *See Dahlia*, 735 F.3d at 1074; *cf. Lane v. Franks*, 573 U.S. 228, 238–40 (2014)

17   (holding sworn testimony outside ordinary job duties was protected citizen speech).  Applying

18   that standard here, the undisputed facts establish that Walsh's extensive cooperation was speech

19   as a private citizen sufficient to proceed to the remaining steps of the *Pickering* analysis.

20        **C.    Substantial or Motivating Factor**

21        While Walsh's participation in the FBI investigation is protected speech, to establish a

22   prima facie case of First Amendment retaliation Walsh also "bears the burden of showing the

23   state took an adverse employment action against [him]" and that his "speech was a substantial or

24   motivating factor in the adverse action."  *Burch*, 146 F.4th at 837 (citing *Greisen*, 925 F.3d at

25   1113; *Eng*, 552 F.3d at 1071)).  The third step of the *Pickering* analysis involves two distinct

26   inquiries: "(1) whether any of [the defendants'] alleged acts constitute an adverse employment

27   action; and (2) if so, whether [the plaintiff's protected speech] was a substantial or motivating

28   factor for the adverse employment action(s)."  *Id.*

1     Courts in the Ninth Circuit apply the "'reasonably likely to deter' test" to determine if an

2   adverse employment action occurred. *Dodge*, 56 F.4th at 778 (quoting *Greisen*, 925 F.3d at

3   1113); *see also Coszalter v. City of Salem*, 320 F.3d 968, 976 (9th Cir. 2003). That is, the

4   plaintiff must show "the actions taken by the defendants were reasonably likely to deter [plaintiff]

5   from engaging in protected activity under the First Amendment." *Coszalter*, 320 F.3d at 976

6   (alterations in original omitted); *see also Ellins*, 710 F.3d at 1061. In First Amendment retaliation

7   cases, the "precise nature of the retaliation is not critical to the inquiry" and instead, "[v]arious

8   kinds of employment actions may have an impermissible chilling effect. Depending on the

9   circumstances, even minor acts of retaliation can infringe on an employee's First Amendment

10  rights." *Coszalter*, 320 F.3d at 974–76 (citing *Rutan v. Republican Party*, 497 U.S. 62, 75–76

11  (1990)). At its core, the analysis asks if the alleged adverse employment action "would chill or

12  silence a person of ordinary firmness from continuing to speak out." *Dodge*, 56 F.4th at 779

13  (quoting *Bethel Sch. Dist.*, 608 F.3d 540, 543 n.1 (9th Cir. 2010) (internal quotations omitted)).

14    Walsh alleges he suffered an adverse employment action when he was twice denied a

15  promotion. Opp'n at 20; *see also* Compl. (Introductory Statement). Defendants disagree and

16  instead argue they are entitled to summary judgment because Walsh never completed the

17  application process for either promotion and he was, therefore, never denied a promotion.

18  Defendants cite no caselaw to support their arguments. Mem. P. & A. at 14–15.

19    While public employees are not constitutionally entitled to a promotion, *see Nunez*,

20  147 F.3d at 871–72, a public employer may not deny or refuse to consider an employee for a

21  promotion "on a basis that infringes his constitutionally protected interests—especially, his

22  interest in freedom of speech," *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); s*ee also Rutan v.*

23  *Republican Party of Illinois*, 497 U.S. 62, 72 (1990). That is, failure to promote or a "refusal to

24  consider for promotion" may constitute an adverse employment action in the Ninth Circuit.

25  *Shenbaum v. City of Manhattan Beach*, No. 2:22-CV-08062-KS, 2025 WL 1434666, at *12 (C.D.

26  Cal. May 16, 2025) (quoting *Brooks v. City of San Mateo*, 229 F.3d 917 (9th Cir. 2000)); *see also*

27  *De Markoff v. Superior Court of California*, No. 1:11-CV-02017 AWI MJS, 2014 WL 2895200,

13

1    at *3 (E.D. Cal. June 25, 2014) ("A reasonable jury could find that being passed over for the

2    [promotion] is an adverse employment action.").

3         While the denial of a promotion can constitute an adverse employment action, the primary

4    dispute in this matter is whether defendants denied Walsh a promotion or took some other related

5    adverse employment action sufficient to support his retaliation claim.  Defendants point to

6    undisputed evidence Walsh never completed the application process for either promotion.  Opp'n

7    SUF Nos. 56, 78–80.  In response, Walsh avers he could have "compete[d] for the position based

8    on his qualifications and exceptional performance record" if Stiles had informed him he could

9    have renewed his Class A license after appointment, if the Authority had granted him a grace

10   period, or if the Authority had not changed the job requirements before the 2020 Foreman job

11   posting.  Opp'n at 21.

12        Viewing the evidence in the light most favorable to Walsh, as the court must do at this

13   stage, a reasonable factfinder could conclude that Walsh suffered at least one adverse

14   employment action when considering applying for the 2020 Foreman position.  The Ninth

15   Circuit's broad definition of adverse employment action in the context of First Amendment

16   retaliation cases includes "the imposition of a burden," and a reasonable jury could find the

17   requirement that a Foreman have a Class A license amounted to such a burden, particularly when

18   past Foreman positions had not required a Class A license and other job postings previously

19   allowed a grace period for interviewees to obtain the necessary license.  *Coszalter*, 320 F.3d at

20   975.  Similarly, a jury could find Stiles provided Walsh misleading or incorrect information about

21   his eligibility to apply for a promotion.  Given that the Foreman license requirements changed

22   and no grace period was permitted, whether by virtue of a mistaken representation or intentional

23   deprivation, a jury could find Walsh was "denied a chance" or otherwise "blocked" from pursuing

24   that promotional opportunity.  *Ricci v. DeStefano*, 557 U.S. 557, 574 (2009); *Ballou v. McElvain*,

25   29 F.4th 413, 427 (9th Cir. 2022) (finding adverse employment action when plaintiff's public

26   employer "block[ed] her path to promotion").

27        A reasonable jury, however, could not conclude Walsh suffered any adverse employment

28   action related to the 2021 Superintendent application process.  The undisputed evidence shows

14

1    Walsh withdrew from the 2021 Superintendent position after learning Martin encouraged another

2    employee to apply for the position.  Opp'n SUF Nos. 78–80.  Based on "his extensive knowledge

3    of how the Authority operates" and what he claims would have been the futility of participating in

4    "a predetermined process," Walsh withdrew his candidacy after being offered an interview.

5    Opp'n at 22; Walsh Dep. at 295.  Despite Walsh's subjective belief that continuing with his

6    application would have been futile, there is no evidence the Authority imposed any additional

7    burden on him, denied him the opportunity to compete, or otherwise took action that would chill

8    an employee of ordinary firmness from speaking.  *See Ricci*, 557 U.S. at 574; *Ballou*, 29 F. 4th

9    at 427.  Martin's encouraging Harris to apply is too indirect to constitute an adverse action; it was

10   Harris's ultimate decision to enter the applicant pool.  Opp'n SUF Nos. 78–80.  Walsh cannot

11   claim he was burdened because a similarly situated and qualified colleague also sought the

12   Superintendent position when no evidence in the record shows Martin had the ability to

13   unilaterally select Harris over Walsh or that he encouraged Harris to apply to block Walsh.  To

14   allow Walsh's claim to proceed on these speculative grounds would not be consistent with the

15   summary judgment standard applicable here, and would signal the Authority could be held liable

16   based on the decision of another employee to apply for a promotion.  That is not the law.  The

17   2021 Superintendent hiring process cannot support a reasonable jury's finding of any adverse

18   employment action.

19          Because a reasonable jury, however, could find at least one adverse employment action

20   related to the 2020 Foreman hiring process, in the form of Walsh's being effectively blocked

21   from applying, the court next assesses whether Walsh's protected "speech was a substantial

22   motivating factor for the adverse treatment he received."  *Ulrich v. City & Cnty. of San*

23   *Francisco*, 308 F.3d 968, 979 (9th Cir. 2002).  A public employee can establish their speech was

24   a substantial or motivating factor with either direct or circumstantial evidence.  *Id.* (citing *Allen v.*

25   *Iranon*, 283 F.3d 1070, 1074 (9th Cir. 2002)).  The inquiry required to resolve the question is

26   fact-specific and "normally should be left for trial."  *Id.* (citing *Hunt v. Cromartie*, 526 U.S. 541,

27   552 (1999) ("[I]t was error in this case for the District Court to resolve the disputed fact of

28   motivation at the summary judgment stage.")).  A district court nevertheless may resolve a

15

1    motion for summary judgment at this step "when taking all the evidence together in a light most

2    favorable to [the non-moving party], a reasonable factfinder could not find that the [protected

3    speech] was a substantial or motivating factor of the [adverse employment action.]"  *Shenbaum v.*

4    *City of Manhattan Beach*, No. 2:22-CV-08062-KS, 2025 WL 1434666, at *15 (C.D. Cal. May 16,

5    2025) (citing *CarePartners LLC v. Lashway*, 428 F. App'x 734, 736 (9th Cir. 2011)).

6          Where an employer knew of the employee's speech, there are "three ways in which a

7    plaintiff can show that retaliation was a substantial or motivating factor behind a defendant's

8    adverse employment actions": a plaintiff may present evidence of temporal proximity between

9    the protected speech and the adverse action, the employer's opposition to the speech, or that the

10   employer's stated reasons were false and pretextual.  *Coszalter*, 320 F.3d at 977 (citing *Keyser v.*

11   *Sacramento City Unified School District*, 265 F.3d 741 (9th Cir. 2001) (as amended)).

12         Here, Walsh asserts the change in the Class A License requirement reflected in the 2020

13   job posting was pretextual.  Opp'n at 17–20.  It is undisputed the requirements of the Foreman

14   position changed between 2014 and 2020, which had the effect of excluding Walsh from Foreman

15   promotion eligibility assuming he needed to have the license in hand by the application due date.

16   Opp'n SUF Nos. 56, 78–80.  Similarly, it is undisputed the Authority previously offered some

17   applicants for other non-Foreman positions a grace period during which they could secure the

18   necessary license after appointment.  *See* Walsh Dep. at 256–59; 2020 Foreman Job Posting at 15.

19   It also is undisputed that Stiles and the Authority did not offer Walsh any grace period to renew

20   his lapsed Class A license.  *See* 2024 Maintenance Job Posting at 41; Walsh Dep. at 263–267;

21   Stiles Dep. at 28–31.

22         But giving proper weight to the undisputed evidence Walsh points to, the record does not

23   support a reasonable factfinder's drawing the inference that defendants' stated rationale for

24   requiring a Class A License or denying Walsh a grace period was pretextual.  In *Coszalter*, the

25   Ninth Circuit recognized that in many situations, but not always, "[r]etaliation often follows

26   quickly upon the act that offended the retaliator."  320 F.3d at 978.  While a short length of time

27   between the precipitating protected speech and the adverse employment action can support an

28   inference of retaliation, there is no period of time that is "per se too long."  *Id.*  Here, the

1    undisputed evidence shows the Foreman position's requirements changed nearly six years after

2    Walsh's protected speech began; nothing in the record suggests the change was a pretext for

3    excluding Walsh. *Cf. Keyser*, 265 F.3d at 752 (two-year gap too attenuated to establish temporal

4    proximity for retaliation claim). Instead, the undisputed evidence of record supports the

5    conclusion the Authority changed the requirements of multiple positions in and around 2020 to

6    reflect changing duties associated with those positions. Walsh concedes Lee had warned him the

7    requirements would be changing for multiple Authority positions. Walsh Dep. at 272. It is

8    undisputed all the applicants for the Foreman position in 2020 had their Class A License at the

9    time they were interviewed, and Walsh does not allege any of the Foreman applicants, past or

10    present, were provided a grace period that he was denied. Opp'n SUF No. 60; Walsh Dep. at

11    269; *Chuang v. Univ. of Cal. Davis, Bd. of Tr.*, 225 F. 3d 1115, 1123 (9th Cir. 2000) (failure to

12    promote claim requires plaintiff to show similarly situated employees outside the plaintiff's class

13    were treated more favorably). While Walsh argues the license requirement is arbitrary, the

14    undisputed record shows individuals in the Foreman position are required to operate heavy

15    machinery requiring Class A licensure "four to five times a year." *See* Lee Dep. at 18–19; Martin

16    Dep. at 20, 24–25. Even if operating machinery requiring a Class A license is not an "integral"

17    part of a Foreman's daily duties, Martin Dep. at 20, 24–25, it cannot be disputed defendants had

18    legitimate reasons for requiring Foreman applicants to have the required Class A license in order

19    to do their jobs.

20            This case thus stands in sharp contrast to Ninth Circuit cases in which a plaintiff was

21    found to have presented sufficient evidence of pretext under the *Eng-Pickering* test. In *Coszalter*,

22    the government employer's negative statements about public employees' protected speech

23    coincided closely in time with the alleged adverse actions—occurring within months of the

24    protected speech—and the evidentiary record contained inconsistent explanations that allowed a

25    jury's reasonable inference of retaliation. 320 F.3d at 977–8. Here, in contrast, the defendants'

26    explanations regarding the changes to the license requirement changes are consistent and

27    justified, and unrebutted: a Foreman must operate heavy machinery, and while not a daily task,

28    even periodic operation of this machinery requires a Class A license by law. Lee Dep. at 18–19;

1     Martin Dep. at 20, 24–25. In *Keyser*, contemporaneous evidence of hostility toward the

2     employee's speech, combined with suspect justifications for the alleged adverse actions, was

3     enough to raise a genuine dispute at the summary judgment stage. 265 F.3d at 752. By contrast,

4     Walsh has not pointed to comparable inconsistencies in the defendants' justification for

5     effectively blocking him from a promotion or close temporal proximity between his protected

6     speech and the 2020 change in application requirements. Rather, as noted above, the Class A

7     licensing requirement had been under consideration for approximately two years before it was

8     imposed, Walsh's supervisor had warned him of the likely changes at least a year and a half in

9     advance, and Walsh chose not to renew his expired Class A license. Opp'n SUF 55; Walsh Dep.

10     at 249.

11        As a matter of law, given the undisputed facts, Walsh cannot carry his burden to establish

12     a prima facie case of retaliation. At most, Walsh has shown he was disadvantaged by the revised

13     criteria for the Foreman position, not that the Authority adopted the new criteria to retaliate

14     against him for his protected speech. *See Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d

15     1026, 1028 (9th Cir. 2001) ("A plaintiff's belief that a defendant acted from an unlawful motive,

16     without evidence supporting that belief, is no more than speculation or unfounded accusation.").

17     On this record, no reasonable factfinder could conclude Walsh's speech was a substantial or

18     motivating factor behind the change in promotional requirements. The court therefore grants

19     defendants' summary judgment motion. See *CarePartners LLC v. Lashway*, 428 F. App'x 734,

20     736 (9th Cir. 2011).

21        **D.**      **But-For Causation**

22        For the reasons explained above, the court need not proceed to the fourth or fifth steps of

23     the *Eng-Pickering* test—"(4) whether the state had an adequate justification for treating the

24     employee differently from other members of the general public; and (5) whether the state would

25     have taken the adverse employment action even absent the protected speech"—as Walsh has not

26     pointed to sufficient evidence to survive summary judgment as to a prima facie case of retaliation.

27     *Eng*, 552 F.3d at 1070.

Even assuming, *arguendo*, Walsh could establish a prima facie case of retaliation in violation of the First Amendment, his claim still would fail under the fifth *Eng–Pickering* step, sometimes referred to as the "but-for causation" analysis, as the undisputed facts in the record show the Authority "would have reached the same adverse employment decision even in the absence of the employee's protected speech." *Id.* at 1071 (quoting *Thomas v. City of Beaverton*, 379 F.3d 802, 808 (9th Cir. 2004) and *Ulrich*, 308 F.3d at 979)) (internal alterations omitted). At hearing, Walsh's counsel argued the court should not proceed beyond the first three *Eng-Pickering* prongs because defendants failed to assert or brief the matter beyond arguing there is no prima facie case of retaliation underlying Walsh's claim in the first instance. At hearing, defendants agreed their motion focused primarily on the prima facie case and not the lack of but-for causation or the permissibility of their actions under *Pickering*. Under Federal Rule of Civil Procedure 56(f), the court may grant summary judgment on grounds not raised by a party after giving notice and reasonable time to respond. Fed. R. Civ. Pro. 56(f)(2). Here, Walsh both briefed the but-for causation prong in his opposition and the court gave counsel a chance to further address the prong at the hearing. *See* Opp'n at 20–22.

The court, in its discretion, therefore addresses the but-for prong of the *Eng-Pickering* test. The court also finds it appropriate to address the question of but-for causation because it "relates to, but is distinct from, the plaintiff's burden to show the protected conduct was a substantial or motivating factor." *Eng* 552 F.3d at 1071–72 (citing *Mt. Healthy*, 429 U.S. at 287). At this stage, the burden would rest with the government employer to show it "would have reached the same [adverse employment] decision even in the absence of" the protected speech. *Id.* (quotations omitted); *see also Boquist v. Courtney*, 32 F.4th 764, 777–78 (9th Cir. 2022). But-for causation analysis asks "whether the 'adverse employment action was based on protected *and* unprotected activities,' and if the state 'would have taken the adverse action if the proper reason alone had existed.'" *Id.* (emphasis in original) (quoting *Knickerbocker v. City of Stockton*, 81 F.3d 907, 911 (9th Cir. 1996)). The Ninth Circuit has held that where defendants present adequate, non-retaliatory justifications for the challenged actions, summary judgment is proper. *See, e.g.*, *Burch*, 146 F.4th at 839–40 (finding no genuine dispute defendants met fourth and fifth

19

1    *Pickering* steps where independent reasons supported the employment actions). In other words,

2    as applicable to this case, the "government officials do not violate a plaintiff's First Amendment

3    rights if they had an objectively legitimate need to" change the Foreman hiring qualifications and

4    "would have implemented the same [changes] in the absence of any retaliatory motive." *Boquist*,

5    32 F.4th at 778.

6        There is no genuine dispute based on the record before the court that Walsh's speech was

7    not the but-for cause of the alleged adverse employment action, even when the court "assume[s]

8    the truth of [Walsh's] allegations." *Eng*, 552 F.3d at 1071. Rather, the record establishes

9    independent, non-retaliatory reasons for the defendants' decision to change the Foreman

10    application requirements: a Foreman is expected to operate heavy machinery requiring a Class A

11    license. Lee Dep. at 18–19; Martin Dep. at 20, 24–25. The record similarly supports an

12    independent, non-retaliatory reason for not promoting Walsh: he never completed the application

13    process to be considered for the Foreman promotion and he lacked a valid Class A license.

14    Opp'n SUF 56, 78–80. To conclude otherwise would signal the Authority should have

15    considered Walsh for a promotion despite his decision to not apply and his not meeting one of the

16    requirements. Under that standard, the Authority would be forced to consider every employee for

17    a promotion whether he met the minimum requirements and its authority to establish and enforce

18    legitimate hiring criteria would be eviscerated. The court cannot adopt such a rule, as it would be

19    both unworkable in practice and inconsistent with the governing First Amendment retaliation

20    framework.

21        Defendants present undisputed evidence that Walsh did not meet the posted requirements

22    for the Foreman position, and the record does not support a reasonable factfinder's concluding

23    that defendants retaliated against Walsh by failing to promote him to a position for which he

24    neither completed the application nor met the minimum requirements. *Simpson v. Pomona*,

25    No. 2:23-CV-02842-AB-PVC, 2024 WL 4710801, at *6 (C.D. Cal. Oct. 16, 2024). Accordingly,

26    even if Walsh had satisfied the first three *Eng–Pickering* steps, his claim still fails as a matter of

27    law because the undisputed facts in the record demonstrate Walsh's speech was not the but-for

28    cause of his not obtaining a promotion.

1    **E.    Individual Liability under Section 1983**

2    To assign liability to each individual, non-entity defendant under § 1983, Walsh

3    ultimately would have to prove the defendant acted under color of state law; defendant's acts

4    deprived plaintiff of particular rights under the constitution; and the conduct was an actual cause

5    of the claimed injury. *See West v. Atkins*, 487 U.S. 42, 48 (1998).  Because the court concludes as

6    a matter of law Walsh suffered no deprivation of his First Amendment rights, his claims against

7    each of the defendants in their individual capacity must be dismissed.

8    **V.    CONCLUSION**

9    For the foregoing reasons, the court **grants** defendants' motion for summary judgment.

10   The clerk of court is directed to close the case.

11   This order resolves ECF No. 23.

12   IT IS SO ORDERED.

13   DATED:  September 24, 2025.

_____
SENIOR UNITED STATES DISTRICT JUDGE